[No. 17598. Department Two. May 25, 1923.]

MONKS & MILLER, INCORPORATED, *Respondent*, v.
FRED W. FEIN *et al.; Appellants.*[1]

EXECUTION (28)—LEVY—MODE OF MAKING—PERSONAL PROPERTY—
RIGHTS OF THIRD PERSONS. As against a vendee or creditor of the
defendant, the acts essential to a valid levy upon defendant's prop-
erty must be proved with greater strictness than would be necessary
as against the defendant.

SAME (28)—LEVY—MODE OF MAKING—PERSONAL PROPERTY—
"MANUAL DELIVERY." Under Rem. Comp. Stat., § 659, requiring that
a levy upon personal property capable of manual delivery must be
by taking it into custody, it is not a valid levy as against a subse-
quent bona fide purchaser from the defendant, for the sheriff to
view the chattels in the presence of the defendant at his home, and,
without touching them, to warn the defendant that they must not be
moved and would be sold, and to leave them in defendant's posses-
sion upon his stating that they would not be moved.

SAME (28)—LEVY—MODE OF MAKING—PERSONAL PROPERTY—DE-
FENDANT AS AGENT OF SHERIFF. In such a case, the defendant did not
become the agent of the sheriff for the purpose of holding the prop-
erty, although defendant stated, when warned not to move it, that
"it would be there, it would be safe with him"; as the same cannot
be construed as a promise to hold it for the sheriff.

Appeal from a judgment of the superior court for
Kitsap county, French, J., entered March 11, 1922,
upon findings in favor of the plaintiffs, in an action to
recover property levied upon under execution, tried
to the court. Affirmed.

*Alexander, Bundy & Swale,* for appellants.
*James W. Reynolds,* for respondent.

PARKER, J.—Monks & Miller commenced this pro-
ceeding under § 573, Rem. Comp. Stat. [P. C. § 7843],
relating to adverse claims of property levied upon,
seeking recovery of certain personal property from the
defendant, sheriff of Kitsap county, which he claimed

[1]Reported in 215 Pac. 525.

to hold by virtue of a levy upon and seizure thereof in pursuance of an execution issued upon a judgment of the superior court of that county against H. C. Emmons in favor of Western Forest Products Company. Monks & Miller claim title to the property under a bill of sale therefor, executed and delivered by Emmons to them, and the due recording thereof in the office of the auditor of Kitsap county, before the making of a valid levy upon or seizure thereof by the sheriff. The cause was tried and submitted to the superior court for Kitsap county, sitting without a jury, which trial resulted in findings and judgment being rendered in favor of Monks & Miller, adjudging their title to be superior to the claimed lien of the levy under the execution, from which judgment the sheriff and Western Forest Products Company have appealed to this court.

On October 30, 1921, the sheriff had in his possession the execution in question, authorizing him to seize and sell property of Emmons in satisfaction of a judgment rendered against him in favor of Western Forest Products Company. So armed, the sheriff went to the home of Emmons, in Kitsap county, and, as he claims, there seized and exercised acts of dominion over one Federal truck, one Fairbanks-Morse scales, one circle saw on skids, one gas tank and pump, and one electric generator, all then belonging to Emmons, such as to constitute a valid levy upon and seizure thereof under the execution. This was all done by a deputy acting for the sheriff. He did not then touch, or in any sense take physical possession of, any of this property, though what he then and there did and said, he claims, had that effect in law. He was, we may assume, with Emmons in the presence of the truck and the gas tank. He saw the scales, which were at a considerable distance from Emmons' house, before he came into the

presence of Emmons. It is doubtful as to whether or not he saw the electric generator, and it is clear that he did not see the circle saw at all, it being a mile or more away in the woods. Touching what was there done and said, as between Emmons and the deputy, Emmons testified in part as follows:

"Q. State what the conversation was you had with him? A. He came to the house and said, 'I came over to take your goods,' and then he asked me where the various articles were located and I told him and he said, 'I would like to go over and see the truck,' which he did. . . . He had a letter with a list and he asked me where the saw was and I told him up in the woods on the hill and the generator was at my house, and he said, 'well, I saw the scales as I came by and know where they are,' and there was no further conversation in regard to the other things. The jitney man brought him over and he asked him if he could drive the truck and he said no. . . . He said, 'well, I will leave this truck here, but I want you to understand these articles are all seized and will be sold, and if you dispose of them or take the truck away you will be liable to arrest.' Then we walked back over to where the car was and he walked back in the back there and looked in the building I have where the generator was and we walked out to the car and I asked him about the things when they would be sold, and he told me they would be advertised and sold, and as a final warning he told me not to dispose of any of the things, and he went away. Q. The things were left in your possession? A. Yes, sir. Q. The same as they were before? A. Yes, sir. Q. Did he say anything to you about, or did you give him any bond of any kind for any of the things? A. No, sir. Q. And that is the only conversation you had with him at all? A. Yes, sir. Q. Was there any notice put up on the garage or the truck? A. No, sir. Q. Then he told you not to move it? A. Not to take it away. Q. That he had levied on it? A. Yes, sir. Q. And you told him you would not? A. I told him I wouldn't steal it, if he levied on it it

would be there. Q. You took the responsibility of that?
A. I wasn't going to take it away. Q. And you wouldn't
let anybody else take it away? A. . . . I was not
to dispose of it or take it away.''

The only testimony which can be considered as in
the least in conflict with this version of Emmons as to
what was there done and said is that of the deputy, as
follows:

''Q. What response, if any, did Mr. Emmons make
to you when you told him you were leaving the prop-
erty in his care? A. He said it wouldn't be moved, it
would be there, it would be safe with him.''

Nothing further was done toward exercising domin-
ion over the property by the sheriff until after Novem-
ber 4, 1921, when Emmons executed in due form and
delivered to Monks & Miller a bill of sale for the prop-
erty, which was immediately duly recorded in the office
of the auditor of Kitsap county. This bill of sale was
given for a valuable consideration, plainly fully equal
to the value of the property, consisting of a credit
given by Monks & Miller to Emmons upon a consider-
ably larger indebtedness owing from him to them.
Thereafter the sheriff assumed to exercise dominion
over the property, and was proceeding to advertise
and offer the same for sale under the execution when
this proceeding was commenced, which thereafter re-
sulted in a judgment in favor of Monks & Miller and
this appeal therefrom, as above noticed.

The decisions seem to be in conflict touching the
question of just what acts on the part of an officer
armed with an execution or attachment constitute a
valid, effective levy upon personal property. It seems
that, in the absence of some statutory provision ex-
pressly prescribing the acts to be performed to con-
stitute an effective levy, the courts have been somewhat

liberal in their views looking to the supporting of a claim of levy and have not in all cases required an actual physical seizure in taking possession of the property by the officer; and have in some instances upheld levies as being valid where the officer declared, in the presence of the property, his intention to levy upon it, he then having power to take it into his possession, though he may not have actually taken it into his possession. The uncertainty which has led to numerous controversies by allowing such loose practice seems to have prompted the enactment of statutes in several of the states prescribing what the officer shall do to effectually make a levy. Manifestly, certainty of there being or not being a levy made at a given time often becomes very important, especially when title to or lien upon the property claimed to have been levied upon is acquired by a third person from the judgment creditor, as in this case, after the acts claimed to have constituted the levy are performed. In such case, even in the absence of a statute prescribing what acts shall constitute a levy, the courts have generally required more pronounced overt acts on the part of the officer and stricter proof thereof in order to sustain a levy. In 2, Freeman on Judgments (3d ed.), p. 1450, that learned author says:

"When the person against whom the levy is sought to be asserted is a vendee or creditor of the defendant in execution, the various acts essential to a valid levy must be proved with greater strictness than when the interests of the defendant are in question."

Such is the situation here; for it is beyond question that Monks & Miller acquired perfect title to the property here in question by proper conveyance from Emmons, except as such title might be impaired by the claimed levy made a few days before the execution of such conveyance. Now our state belongs to that class

which has enacted statutes specifically prescribing the manner of making a levy, both under executions and attachments. In § 578, Rem. Comp. Stat. [P.C. § 7893], relating to the levy of executions upon personal property, it is provided:

"578.   When the writ of execution is against the property of the judgment debtor, it shall be executed by the sheriff as follows:

"4.   Property shall be levied on in like manner and with like effect as similar property is attached."

and turning to § 659 [P. C. § 7391], relating to the manner of levying attachments upon personal property, we read:

"2.   Personal property capable of manual delivery shall be attached by taking into custody."

It would hardly seem possible to use language more effectually expressing the legislative intent that a levy upon physical personal property to be effective must be made by acquiring and receiving by "manual delivery" of the property. This property, being wholly physical and not intangible, was manifestly capable of "manual delivery." This view is further supported when we look to other subdivisions of § 659, especially as originally enacted in 1886 (see page 42, Laws of 1886) wherein there was then the present subd. 3, relating to the attachment of intangible property in the nature of shares of stock in a corporation, and also subd. 4, since then superseded by our later garnishment statute, relating to the attachment of intangible property in the nature of credits; in other words, attachment by garnishee process. So it seems plain that the words "manual delivery" and "taking into custody", found in subd. 2 of § 659, above quoted, mean literally what they say. This, of course, does not mean but that a sheriff, armed with an execution or attachment, may not, by his agent, take and hold the property

and thus make such agent's possession his possession. But, noting the facts of this case as disclosed by the testimony above quoted, we think it cannot be said that Emmons ever became the agent of the sheriff for the holding of this property. We do not overlook the words of Emmons as testified to by the deputy that "It wouldn't be moved, it would be there, it would be safe with him"; but even that, we think, cannot be construed as a promise on the part of Emmons that he would hold the property for the sheriff. Manifestly, Emmons contemplated the holding of the property for himself. So we think it cannot be said that the possession and enjoyment of the property of Emmons, to the extent which he desired to possess and enjoy it, were in the least impaired or interfered with by the deputy in his claim of levy upon it.

We are impressed with the soundness of the observations of Judge Trimble of the Missouri court of appeals in *Hobbs v. Williams*, 175 Mo. App. 409, 162 S. W. 334, made in reviewing the prior holdings of the courts of that state under a statute similar to ours, which uses, however, the words "actual seizure" instead of "manual delivery", as ours does; our statute apparently even more thoroughly excluding the notion of constructive possession than did the Missouri statute. He said:

"Upon the question as to what is necessary to constitute a levy, there is apparently much conflict among the decisions of the various states; some holding that an actual seizure is unnecessary, and others that it is. Those holding to the latter view have usually been influenced by statutes bearing on the subject. Our state belongs in this latter class, because we have a statute defining the word 'levy' as meaning 'the actual seizure of property by the officer charged with the execution of the writ.' Section 2195, R. S. Mo. 1909.

And in *Douglas v. Orr,* 58 Mo. 573, loc. cit. 575, it is said: 'The word "levy" as defined by our statute means actual seizure, that is, the officer must take actual possession of the goods, and this language would seem to exclude all idea of a constructive possession.' And then in determining what constitutes actual possession, the court said there must be enough done by the officer to subject him to an action of trespass, but for the protection of the execution; there must be at least *an exercise of claim of dominion,* though by mere words, the speaker having the goods within his power; the officer must take actual possession which, although the goods are present, can only be done by manual acts, or by an oral assertion that a levy is intended and which is acquiesced in by those who are present and interested in the question. In *Hopke v. Lindsay,* 83 Mo. App. 85, loc. cit. 88, it is said: 'To effect personal property with a lien of an execution, the officer must take that degree of manual possession of the subject-matter of his levy which the nature of the property renders practicable. If it cannot be actually seized, he must take what possession he can, and evidence his seizure by posting notices on the property that it is levied on, or by attaching to it some other marks indicating the special property vested in him by his levy.' In *Shanklin v. Francis,* 67 Mo. App. 457, loc. cit. 463, in speaking of what the officer must do to levy on personal property, it is said: *'He must assume dominion over it.* He must not only have a view of it, but *he must assert his title to it* by such acts as, but for the writ, would make him liable as a trespasser.' "

Iowa, so counsel for appellant informs us, has a statute the same as subd. 2, § 659, of our statute above quoted. In *Peppers v. Harris,* 145 Iowa 635, 124 N. W. 625, holding an attempted levy quite similar to that here involved as being ineffectual, Justice Sherwin, speaking for the court, said:

"The facts connected with the levy are as follows, omitting the date thereof, which is immaterial here: The property was in the livery barn, which was situ-

ated on the rear end of the lot upon which George B. Harris and his wife lived, and only a short distance from their house. The officer having the executions, with one of the plaintiff's attorneys, went to the barn, but found no one there. The officer says that he then made a list of the property, and, after doing so, went to the house for the purpose of telling some one that he was going to take the property away. He found the defendant A. S. Harris in the house, and she then told him that she had a mortgage on the property, and that he must not take it. The officer returned to the barn, and at that time took away with him a part of a harness. Later he removed all of the property in question. At the time the officer made the list of the property, as above stated, he did nothing towards taking manual possession of the property or any part thereof. When he left the barn to go to the house, he had done nothing that interfered with the possession of the owners of the property, or that would make him a trespasser, but for the protection of his writs. In other words, he had exercised no dominion over the property. And, if a stranger had taken it while the officer was at the house, he would not have been guilty of a violation of law.

"It is the rule that, to make a valid levy on personal property, the officer must do something which will amount to a change of possession, or which is equivalent to a claim of dominion over the property, coupled with the power to enforce it. He must do something which would make him a trespasser but for the protection of the writ. *Rix v. Silknitter*, 57 Iowa 262, 10 N. W. 653; *Allen v. McCalla*, 25 Iowa 464, 96 Am. Dec. 56; *Crawford v. Newell*, 23 Iowa 453; *Techmeyer v. Waltz*, 49 Iowa 645; *Hibbard v. Zenor*, 75 Iowa 471, 39 N. W. 714, 9 Am. St. Rep. 497."

The later decision of that court in *Lee County Sav. Bank v. Snodgrass Bros.*, 182 Iowa 1387, 166 N. W. 680, it may be suggested, somewhat weakens the conclusion reached in *Peppers v. Harris, supra,* but a critical reading of that decision will show that some of the prop-

erty there sought to be levied upon was actually seized and taken away by the officer at the time he claimed to have made the levy; and besides, the question seemed to be as to the effectiveness of the levy as against a somewhat defective chattel mortgage. Our decision in *Cupples v. Level,* 54 Wash. 299, 103 Pac. 430, 23 L. R. A. (N. S.) 519, we think, is not out of harmony with the views we have here expressed. Indeed, some observations made in that decision lend support to our present conclusion. We are of the opinion that Monks & Miller took title to the property in question entirely free of any claim of lien which could be made by virtue of the pretended levy drawn in question. Of course, we are not concerned with what the sheriff may have done looking to the making of a levy thereafter, because, however complete and valid such levy might have thereafter been, it would be ineffectual as against the title acquired by Monks & Miller under the bill of sale.

The judgment is affirmed.

MAIN, C. J., FULLERTON, TOLMAN, and PEMBERTON, JJ., concur.